Reversed and Remanded and Opinion
filed June 17, 2010.

 

In
The

Fourteenth
Court of Appeals



NO. 14-09-00166-CR



Patrick Stephen
Kelly, Appellant 

v.

The State of
Texas, Appellee 



On Appeal from
the 241st District Court

Smith County, Texas

Trial Court
Cause No. 241-1428-07



 

OPINION

Appellant Patrick Stephen Kelly, the third of the
alleged “Mineola Swingers”[1]
tried in Smith County, Texas, was charged with and convicted in August 2008 of
a single count of engaging in organized criminal activity.  The organized
criminal activity involved two predicate offenses of aggravated sexual assault
of a child.  He was sentenced to confinement for life.  In forty-three issues,
appellant challenges numerous aspects of his trial.  In this opinion we will
review only those points of error essential to our decision.  We conclude the
evidence was legally sufficient to support the conviction, but we find the case
should be reversed and remanded for a new trial due to numerous evidentiary
errors by the trial court and improper closing argument by the State.  These
errors prevented appellant from presenting a complete defense to the jury,
resulted in other harm to the appellant, and violated appellant’s right to
confront the witnesses against him.

I.  Background

This case began in March 2005 when the Department of
Family and Protective Services (“DFPS”) authorities in Smith County removed two
children, Shannon, age seven, and Holden, age six,[2] from the
home their mother Shauntel Mayo shared with Jamie Pittman.  The children were
removed after allegations of abuse and neglect were received by Smith County
DFPS.  After their removal, the children were placed in several foster homes
before being placed with foster parents John and Margaret Cantrell.  At their
first few foster homes, there were indications of problems with the children: 
Holden suffered from bowel issues and was very aggressive, and Shannon acted
very afraid. 

Several months after being removed from their parents
and once they were placed with the Cantrells, the children began to make
outcries involving a ring of adults, including appellant.  These adults
allegedly engaged in training the children, along with their younger sister,
Cathy, age four, and their aunt, Ginny, age six, to perform in a sexual manner
in a club.  The outcries began when the Cantrells took Shannon and Holden by an
empty building they were considering purchasing in Mineola.  The Cantrells
immediately took the children to the Mineola Police Department (the “Mineola
PD”) in Wood County, but after a one- to two-day investigation, the Mineola PD
did not file any charges.[3] 


Because the children were removed from their home in
Smith County, the Cantrells and the Smith County DFPS enlisted the assistance
of the Smith County District Attorney’s office to further inquire into the
children’s allegations.  Texas Ranger Phillip Kemp opened an investigation
after being contacted by the Smith County District Attorney’s office.  Kemp
interviewed Shannon and Holden and through his investigation discovered that
Cathy and Ginny were also involved in the alleged sexual exploitation ring. 
Cathy and Ginny were both removed from the home of Sheila and Jimmy Sones.[4]  Cathy also
was placed with the Cantrells; Ginny was first placed with Sheri Ellington and
then was placed with Virginia Bookout.  

Shannon and Holden identified the building in Mineola
as a “club” in which they had performed sexual acts for numerous adults in
exchange for money collected by appellant and others, including Mayo.  The
children described a “sexual kindergarten” in which adults[5], including Pittman,
Mayo, and appellant, trained them to masturbate, strip, and engage in sexual
contact with each another.  The children then performed sexual acts at the club
in Mineola, where numerous other adults watched, paid money, and filmed them
engaging in the acts.  The children also explained that the adults (Pittman,
Mayo, and appellant) had given them “silly pills,” which made them more willing
to act in this manner. 

Following Kemp’s investigation, appellant and others
were indicted for multiple counts of aggravated sexual assault of a child,
sexual performance of a child, and engaging in organized criminal activity.  Appellant
was charged with engaging in organized criminal activity; with two predicate
offenses of aggravated sexual assault of a child involving Shannon and Holden.

The evidence at appellant’s trial was hotly
contested.  Appellant took the stand and denied the allegations.  The club had
been leased to Russ and Sherry Adams, was open for only four months, and closed
in September 2004.  Sherry Adams testified that she had the only key to the
club and that the club was for adults only.  She denied ever seeing appellant
at the club.  Appellant presented several other witnesses who testified that
they were at the club and that no children were ever present and that appellant
was never at the club.

The children initially denied abuse or that anything
had happened in the club.  Shannon and Holden were interviewed twice in May and
June 2005 and denied any abuse.  The Kemp interview took place in November 2005,
and it was in this interview that Shannon first described the alleged abuse.  Holden
initially denied the abuse until both Shannon and Margaret Cantrell were
allowed to question him and lead him into remembering abuse.  Neither child
identified a picture of appellant in this interview.

Neither Margaret nor John Cantrell testified, even
though Margaret was the designated outcry witness for Shannon, Holden, and
Cathy.  Shortly before the trial began, appellant’s trial counsel discovered
that John was being investigated in California for a claim of sexual abuse of
foster children.  Both John and Margaret were subpoenaed to testify for
appellant, but outside the presence of the jury, both invoked their Fifth
Amendment right not to testify.  The trial court then refused to allow any
questioning of any witness about this claim against John Cantrell, any possible
motive for Margaret Cantrell to have “coached” the children, or why Margaret
Cantrell was not testifying in this trial as she had in the two prior trials. 

After hearing all the evidence and arguments of
counsel, the jury found appellant guilty as charged in the indictment and
sentenced him to confinement for life.  Appellant timely appealed.

II.  Issues Presented

            Appellant
identified forty-three issues for our review.  We will not discuss the issues that
are unnecessary to our decision.  We will first review the legal sufficiency of
the evidence (issue 24), then violation of the right to present a complete
defense, certain evidentiary errors and improper jury argument, and finally,
violations of the Confrontation Clause.  Because we conclude that those errors
support reversal, we do not reach appellant’s issues one, four through nine,
eleven and twelve, eighteen, twenty through twenty-three, twenty-five, and
twenty-eight through forty-three.

We begin our review of appellant’s issues by
discussing the only issue he identifies which would require us to reverse and
render a judgment of acquittal:  the legal sufficiency of the evidence.

III.  Analysis

A.        Legal
Sufficiency

In his twenty-fourth issue, appellant asserts the
evidence is legally insufficient to support his conviction.  When reviewing the
legal sufficiency of the evidence, we examine all the evidence in the light
most favorable to the verdict to determine whether any rational trier of fact
could have found the essential elements of the offense beyond a reasonable
doubt.  Jackson v. Virginia, 443 U.S. 307, 319 (1979); Williams v.
State, 301 S.W.3d 675, 683–84 (Tex. Crim. App. 2009).  Although we consider
all the evidence presented at trial, we may not re-weigh the evidence or
substitute our judgment for that of the jury.  See Williams v. State,
235 S.W.3d 742, 750 (Tex. Crim. App. 2007).  The jury is the exclusive judge of
the credibility of witnesses and of the weight to be given their testimony;
likewise, it is the exclusive province of the jury to reconcile conflicts in
the evidence.  Wesbrook v. State, 29 S.W.3d 103, 111 (Tex. Crim. App.
2000) (en banc).  Our review of the evidence includes both properly and
improperly admitted evidence.  Clayton v. State, 235 S.W.3d 772, 778
(Tex. Crim. App. 2007).  We consider both direct and circumstantial evidence
and all reasonable inferences that may be drawn from the evidence in making our
determination.  Id.  

Appellant was charged with the offense of engaging in
organized criminal activity, with two predicate offenses of aggravated sexual
assault of a child.  A person commits the offense of engaging in organized
criminal activity if, with the intent to establish, maintain, or participate in
a combination or in the profits of a combination, he commits or conspires to
commit a listed predicate offense.  Tex.
Penal Code Ann. § 71.02(a) (Vernon Supp. 2009); see Nguyen v. State,
1 S.W.3d 694, 695 (Tex. Crim. App. 1999) (en banc).  One of the predicate
offenses listed in section 71.02(a) is aggravated sexual assault.  Tex. Penal Code Ann. § 71.02(a)(1).  As
is relevant here, a person commits aggravated sexual assault if he
intentionally or knowingly causes the sexual organ of a child under fourteen to
contact or penetrate the sexual organ of another person.  Tex. Penal Code Ann. § 22.021(a)(1)(B)(iii),
(a)(2)(B).  The testimony of the complainant is sufficient, without more, to
convict a defendant of sexual assault.  See Tex. Code Crim. Pro. Ann. art. 38.07(a), (b)(1) (Vernon
2005).

Shannon, Holden, Ginny, and Cathy testified at trial. 
Shannon, age eleven at the time of appellant’s trial, testified that she knew
appellant as “Booger Red” and identified him in court.  She described appellant
as a friend of her mother who was at the Mineola club.  She explained that she
went to the club with Holden and Cathy and often saw Ginny there.  Shannon
testified that before performing at the Mineola club, she and the other
children attended “kindergarten” where they learned how to touch themselves and
each other and how to dance.  She stated that appellant and Jamie Pittman
taught the girls at this “kindergarten,” while her mother, Shauntel Mayo, and
her “granny,” Sheila Sones, taught the boys.  According to Shannon,
kindergarten was sometimes conducted in appellant’s home.  She stated that she
and Holden “played doctor” at the Mineola club and that when they did, her
privates touched Holden’s privates while they both had their clothes off.  She
testified that appellant was at the club “watching, sometimes do[ing] nasty
stuff.”  Shannon explained that she often wore revealing clothing and danced at
the Mineola club, where a large group of unidentified adults watched and paid
money to the adults—appellant, Mayo, Pittman, and others.  She also testified
that she, appellant’s wife, Mayo, and occasionally Ginny were videotaped
dancing at the club.  Shannon explained that these videotapes were burned at
appellant’s house.  She further testified that she was given “silly pills” by
her mother and Pittman and that appellant was often there when she took the
pills.[6]

Holden, who was nine years old at the time of
appellant’s trial, testified as follows:  He identified appellant as “Booger
Red,” the “meanest guy” he knew.  He, like Shannon, described a sexual
“kindergarten,” where he learned how to do “bad stuff” by rubbing on dolls.  He
also described and identified the Mineola club; he testified that his mother
and Jamie Pittman took him there and that appellant also was there.  He
explained that he and Shannon “played doctor” at the club in front of other
people and that his privates touched her privates.  According to Holden, the
people in the audience also paid to watch him dance.  He also stated that he
was sometimes videotaped by Jamie or Dennis Pittman when he was dancing, but
that these tapes were burned at appellant’s house.  Holden identified Sheila
Sones as another individual who was involved with the club; according to
Holden, Sones helped make food at the club and watched him perform.

Cathy, age eight at the time of the trial, testified
that she used to live with her grandmother, Sheila Sones.  Cathy explained that
she is the sister of Shannon and Holden.  She, too, identified appellant as
“Booger Red” and stated she knew him from the Mineola club.  She testified that
she went to kindergarten, but appellant was not there.  According to Cathy, she
saw Shannon at the club with Mayo, Jamie Pittman, and appellant.  She, like
Holden, explained that Sones served food at the club.  According to Cathy, “bad
things” happened at the club; for example, she testified that Holden and
Shannon had to take their clothes off at the club.[7]

Nine-year-old Ginny testified as follows:  She lived
with Sheila and Jimmy Sones prior to being removed from their custody by DFPS. 
She described “kindergarten” as a place where “sexual stuff” happened and where
she danced with Cathy, Shannon, and Holden.  She identified appellant as
“Booger Red” and stated that he was at the kindergarten.  She also testified
that she did “sexual stuff” with the other children at the Mineola club.  She
said appellant made her dance, and she was scared of him.  She explained that
Shannon and Holden danced together at the club and “sometimes their privates
would touch.”  Ginny testified that she danced both with clothes on and naked
while people watched.  She said that tapes were made when she danced, but that
Jamie Pittman and appellant burned them.  She testified that the adults,
including appellant, got money from people watching the performances at the
club.

Numerous other witnesses testified, both for the
State and for the defense.  Several DFPS caseworkers recounted their
investigation and the outcries made by the children to various individuals.  Additionally,
Kemp described his investigation and repeated the children’s outcries.  Kemp
and several of the caseworkers testified that they believed the children were
telling the truth.  They also testified that appellant was involved in
“collaborating and carrying out” criminal activity with Mayo, Sheila Sones,
Jimmy Sones, Jamie Pittman, and Daniel Pittman; this “criminal activity”
included the sexual contact between Shannon and Holden.  

Shannon and Holden testified that their sexual organs
contacted each other’s.  Their testimony is sufficient to establish that they
were sexually assaulted.  See id.  Shannon testified that appellant,
Jamie Pittman, and Shauntel Mayo were involved in the “kindergarten,” were all present
at the club when she and Holden danced and performed sexually, and shared in
the money collected from the other club patrons.  Cathy and Ginny also
identified appellant, Mayo, Jamie Pittman, Sheila Sones, Jimmy Sones, and
Dennis Pittman as being involved in the scheme.  This evidence is legally
sufficient to establish that appellant intentionally participated in a
combination involving at least three others to commit aggravated sexual
assault.  See Tex. Penal Code
Ann. § 71.02(a)(1) (engaging in organized criminal activity); Tex. Penal Code Ann. § 71.01(a) (Vernon
2003) (defining “combination” as “three or more persons who collaborate in
carrying on criminal activities”).  We therefore overrule appellant’s
twenty-fourth issue regarding the legal sufficiency of the evidence.  

Although the evidence is legally sufficient to
support appellant’s conviction and thus we do not reverse and render acquittal,
the record of this case is rife with reversible error, which we detail in the
following sections.

B.        Denial
of the Opportunity to Present a Defense 

            In his second and
third issues, appellant asserts the trial court violated his constitutional
right to present a complete defense because the trial court refused to permit
him to develop his theory that John Cantrell abused the children and that the Cantrells
coached them to falsify the allegations against him.  “Whether rooted directly
in the Due Process Clause of the Fourteenth Amendment . . . or
in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, . . .
the Constitution guarantees criminal defendants ‘a meaningful opportunity to
present a complete defense.’”  Crane v. Kentucky, 476 U.S. 683, 690
(1986) (quoting California v. Trombetta, 467 U.S. 479, 485 (1984)).  A
trial court’s ruling excluding evidence may rise to the level of a
constitutional violation if “a trial court’s clearly erroneous ruling
[excludes] otherwise relevant, reliable evidence which ‘forms such a vital
portion of the case that exclusion effectively precludes the defendant from
presenting a defense.’”  Wiley v. State, 74 S.W.3d 399, 405 (Tex. Crim. App.
2002) (quoting Potier v. State, 68 S.W.3d 657, 665 (Tex. Crim. App. 2002)
(en banc)).  

The State did not inform appellant about the charges
against John Cantrell.  Appellant discovered this through information supplied
by the Wood County District Attorney’s office.[8]
The trial court granted appellant a brief continuance to discover information
regarding the charges pending against John Cantrell in California and Margaret’s
possible involvement in them.  John Cantrell had been extradited to California
at the time of this trial.  The trial court assisted appellant in having John
Cantrell returned from California.  Outside the presence of the jury, both John
and Margaret Cantrell then asserted their Fifth Amendment privilege not to
testify.  

The trial court repeatedly instructed appellant that
he would not be permitted to introduce any evidence regarding the charges
against John Cantrell in California.  Agreeing that the evidence was not
relevant, the trial court granted the State’s oral motion in limine preventing
appellant’s counsel from mentioning to the jury that John had been investigated
or arrested on sexual assault charges in California:

So before you were to mention it or bring it up or ask any
witness about it or however it might possibly come up or in opening statement
or however, that -- the Court’s ruling is that those allegations against
John Cantrell out in California made by the witnesses that are in those reports
that we all have and counsel has, the State has, the Court has, are not
relevant to the trial of this case.

(emphasis added).  But
relevant evidence is “evidence having any tendency to make the existence of any
fact that is of consequence to the determination of the action more probable or
less probable than it would be without the evidence.”  Tex. R. Evid. 401.  Clearly, allegations that John Cantrell
had committed similar offenses—sexual abuse of children under his care—were
relevant to appellant’s claim that it was John, not he, who had sexually
assaulted Shannon and Holden.  This evidence also was relevant to his defense
that the Cantrells coached the children into making up these accusations to
divert attention from the charges against John and the possibility that he sexually
abused Shannon and Holden.  This evidence would have shown the Cantrells’ bias,
motive, or interest in accusing appellant and was clearly relevant.  See
Hammer v. State, 296 S.W.3d 555, 569 (Tex. Crim. App. 2009)

Each time appellant’s defense team attempted to bring
these allegations to light and demonstrate their relevance or cross-examine
witnesses about the Cantrells, the trial court warned them against doing so:

I’ve already told you -- in fact, I told you when
you were standing there on the record that I’m not going to allow you to go
into anything about [John Cantrell] that relates to these records that I turned
over to you. . . .  I told you I’m not going to allow you to go into anything
about that, into anything about that, to allow you in the presence of the jury --
outside the presence of jury to determine it to be relevant.  Don’t go
there.[9]


(emphasis added).

After the State rested and before appellant’s counsel
made his opening statement, the trial court reminded appellant:

Are all the Court’s rulings clear as far as what I’ve said
on the record that are contained in the CPS reports I’ve furnished Mr. Davidson[[10]] in
terms of the fact that the Court’s ruling, those as the record stands now, none
of those allegations are relevant to this case.  None of the allegations made --
that grew out of the situation in California.

I’ve tried to go over that specifically so it’s clear to
everyone that the Court is finding that at this point not relevant.

Finally, when appellant’s counsel approached the
bench to suggest that the State’s cross-examination of one of appellant’s
witnesses had “opened the door” to the introduction of these allegations, the
trial court stated unequivocally, “Let me make this clear.  We’re not going to
have any cross or direct on anything that would lead to any response from the
witness about anything done in the California case.  Everyone knows that’s out.”

Evidence that the children’s current foster parent,
John Cantrell, had been accused of sexually molesting foster children under his
care in the past was certainly relevant to appellant’s defense.  See Tex. R. Evid. 401.  Thus, the trial
court’s exclusion of this evidence on relevancy grounds was erroneous.[11]  See Wiley,
74 S.W.3d at 405–06.  Further, by refusing to permit appellant to
present this evidence to the jury, appellant was effectively denied the
opportunity to present his defense.  See Crane, 475 U.S. at 690. 
Indeed, this evidence went “to the heart of [appellant’s] defense.”  See Wiley,
74 S.W.3d at 405.  Information regarding the ongoing investigation of John
Cantrell in California would have provided the jury with evidence that the
Cantrells had a motive to coach the children.  Instead, the jury was left with
appellant’s unexplained implication that the Cantrells had coached the children
into making up these allegations.  The State was able to inoculate against this
incomplete defense by asking its witnesses if they believed the children had
been coached; these witnesses repeatedly stated they did not think the children
had been pressured into making these accusations.  Thus, the jury was left
wondering why appellant would cast such aspersions on the character of the
Cantrells, who had taken on so many children with great success over the years
with no complaints against them.  Incredibly, the prosecutor made a sidebar in
front of the jury, as part of his hearsay objection, that appellant should just
call Margaret Cantrell to the witness stand if he wanted certain evidence.

Of course, the believability of the children’s
testimony is at the heart of this case.  There were no outcries by any child
until after Shannon and Holden had been placed with the Cantrells.  The first
outcry was made to Margaret Cantrell.  Shannon and Holden denied the
allegations in their initial assessment interviews conducted in Wood County, and
it was not until five months later that the children told anyone other than
Margaret Cantrell about the alleged abuse.  This occurred during Kemp’s
interview, at which Margaret Cantrell was present and allowed to ask questions.
 Holden repeatedly denied the allegations in that interview until Shannon was
allowed into the interview to remind him of what had happened and until he was
allowed to talk directly to Margaret during the interview. 

Appellant took the stand and denied the allegations.  His
witnesses testified that appellant had never been at the club and that no
children were ever present at the club, which was open only from May to
September of 2004.  Appellant’s expert witness testified that Kemp’s interviews
of Shannon and Holden were improper because Shannon was allowed to suggest
answers to Holden and because Margaret Cantrell was present and asked questions
and suggested answers to both Shannon and Holden.  In fact, it was Margaret
Cantrell who suggested Booger Red’s name to Shannon.  Appellant’s expert also
testified that Kemp’s interviews of Cathy and Ginny were improper due to the
use of leading questions, suggestive answers, and the improper presence of the
foster parents.  He further testified that children can make false accusations
if they are coached into doing so. 

Under these circumstances, we believe the trial
court’s exclusion of this evidence operated to effectively preclude appellant
from presenting his defense.  See id.  We therefore sustain his second and
third issues.  These constitutional errors are reviewable for harm under Texas
Rule of Appellate Procedure 44.2(a), which requires us to reverse unless we are
convinced, beyond a reasonable doubt, that they did not contribute to the
jury’s verdict.  See Tex. R. App.
P. 44.2(a).  For the reasons enumerated above, we cannot say these
errors did not contribute to appellant’s conviction.  

Although these errors alone are sufficient to reverse
and remand this case, because of the pervasive nature of the errors apparent
throughout appellant’s trial, we continue our review of several of appellant’s
other issues to ensure that, upon remand, these errors are not repeated.

C.        Admission of Other Defendants’ Convictions and Sentences
and Improper Jury Argument

            In his
thirty-fifth, thirty-sixth, and thirty-seventh issues, appellant contends the
trial court violated his constitutional rights and the law by permitting the
State to inform the jury that other jurors had convicted Mayo and Pittman and
sentenced them to confinement for life for their involvement in this child sex
ring.[12] 
The disposition of a defendant’s case is not admissible in the trial of a co-defendant. 
Miller v. State, 741 S.W.2d 382, 389 (Tex. Crim. App. 1987) (en banc); Torres
v. State, 92 S.W.3d 911, 917–18 (Tex. App.—Houston [14th Dist.] 2002, pet.
ref’d).  

Appellant, Pittman, and Mayo were charged with
overlapping offenses.  Appellant was charged with engaging in organized criminal
activity, with the predicate offenses being aggravated sexual assault of
Shannon and Holden.  Pittman was charged with aggravated sexual assault of
Shannon and Holden.  Mayo was charged with engaging in organized criminal
activity with the predicate offenses being aggravated sexual assault of Shannon
and Holden.  These charges all stemmed from the same investigation, involving
the same victims and similar proof.  Thus, appellant, Mayo, and Pittman were
effectively co-defendants in these three trials.

During its questioning of DFPS supervisor Kristi
Hachtel, the State asked if Mayo and Pittman were “involved in this.” 
Appellant’s attorney objected on the basis of lack of personal knowledge and
speculation.  The trial court overruled the objection, and Hachtel testified
that Mayo and Pittman were involved in and had been convicted for the same
offense.  Later, while questioning one of Shannon and Holden’s foster parents,
the prosecutor asked, “As long as we’re on the lines of that previous testimony
[the witness’s testimony from the prior trials], those two individuals were
convicted by a Smith County jury and sentenced to life in prison; is that
right?”[13] 
Appellant objected on relevancy grounds, and the trial court overruled the
objection.  

The fact that both Mayo and Pittman had been
convicted and sentenced to life in prison for their acts had absolutely no
place in appellant’s trial.  See Miller, 741 S.W.2d at 389–90; Torres,
92 S.W.3d at 917–18.  The State’s only defense to this improper questioning and
to this evidentiary error is waiver.  But appellant did not “open the door” for
this information to be admitted into his trial, and he objected each time the
State interjected the convictions and sentences of Mayo and Pittman into his
trial.[14] 
Inexplicably, the trial court overruled his objections to this evidence and
permitted the State to alert the jurors in appellant’s trial that other jurors
had convicted Mayo and Pittman for their involvement in the same child sexual
exploitation scheme.[15] 
No case supports the trial judge’s ruling.  We therefore sustain appellant’s
thirty-fifth through thirty-seventh issues.

In issues thirty-eight and thirty-nine, appellant
contends that his constitutional right to a fair trial was violated when the
State was allowed to make impermissible closing arguments regarding the
disposition of Pittman and Mayo’s cases.  Proper jury argument must fall within
one of four general areas:  (1) summation of the evidence; (2) reasonable
deductions from the evidence; (3) answer to opposing counsel’s argument; and
(4) pleas for law enforcement.  Guidry v. State, 9 S.W.3d 133, 154 (Tex.
Crim. App. 1999).   

Compounding the harm from the trial court’s erroneous
admission of appellant’s co-defendants’ convictions and sentences, the State
emphasized those convictions in its closing argument.  The trial court again
permitted the State to interject these facts into appellant’s trial over
appellant’s objection:

MR. DAVIDSON: 
Your Honor, the Fifth Circuit . . . says these specific kind of statements are
designed to inflame and prejudice the jury.  This is backed up by the case of
Carter versus State, Court of Criminal Appeals of Texas.  And this is way
outside the proper jury argument by Gomez versus State.  This is prejudicing my
client’s right to a fair trial.  It’s denying him due process.  It is depriving
him of anything --

THE COURT:            The
Court’s ruling is he’s not doing any of those things.  Your objections are
overruled.  He is making a closing argument to the jury.  Your objections are
overruled.

MR. DAVIDSON:  These cases are talking about closing
arguments.

THE COURT:            Overruled.

The prosecutor proceeded as
follows: “And you say three down, three to go.  Three down, Jamie Pittman, Shauntel
Mayo, Booger Red.  Three to go, Jimmy Sones, Sheila Sones, Dennis Pittman.  And
you send a message to all of those other perverts --” Appellant objected
and the trial court again overruled his objection.[16]  

These statements were not the only inflammatory
remarks made by the prosecutor during closing argument.  For example, the
prosecutor also stated, “If you think [these children are] lying, you tell me.
If you think they made all of this up because it was fun, you tell me, and we’ll
take them down and indict them, and we’ll say, ‘Booger Red, we are so
sorry.’” (emphasis added).  Appellant’s objection to the inflammatory and
prejudicial nature of this argument was also overruled by the trial court. 

The admission of the conviction evidence was error.  The
State’s closing argument was improper.  We must therefore review whether
appellant’s substantial rights were affected by the erroneously-admitted conviction
evidence and improper argument.  See Brown v. State, 270 S.W.3d 564, 572
(Tex. Crim. App. 2008).  In determining whether appellant’s “substantial
rights” were affected, we must balance the prejudicial effect of the argument,
any curative measures, and the certainty of conviction absent the error.  See
id.  

As noted above, we have not found a single case in
which a trial court overruled an objection to such a comment on a
co-defendant’s conviction.  The argument was clearly inflammatory.  The
argument occurred late in the State’s final closing argument and likely left a
strong impression on the jury.  Thus, the prejudicial effect of the evidence
and the argument was severe.  Further, the trial court took absolutely no
curative measures and instead overruled appellant’s objections.  Cf. Guidry,
9 S.W.3d at 154.  And even an instruction to disregard will not cure remarks
that are so inflammatory that their prejudicial effect cannot reasonably be
removed by an admonishment to disregard.  See McKay v. State, 707 S.W.2d
23, 37 (Tex. Crim. App. 1985) (en banc).  Although appellant might have been
convicted absent this improper argument, when we balance this factor against
the prejudicial nature of the evidence and the prosecutor’s arguments and the
complete lack of curative measures taken to address the error, we are convinced
that appellant’s substantial rights were affected.  

Under these circumstances, we conclude that these
entirely inappropriate, prejudicial, and inflammatory evidence and remarks, to
which appellant’s repeated objections were overruled, constitute reversible
error.  We thus sustain appellant’s thirty-eighth and thirty-ninth issues.  

D.        Violations
of the Rules of Evidence

            1.         Standard
of Review

We review a trial court’s evidentiary rulings for an
abuse of discretion.  Powell v. State, 63 S.W.3d 435, 438 (Tex. Crim.
App. 2001).  We will not disturb the trial court’s ruling if it is “within the
zone of reasonable disagreement.”  Winegarner v. State, 235 S.W.3d 787,
790 (Tex. Crim. App. 2007).  Instead, we will uphold the ruling if it is
reasonably supported by the record and correct on any theory of law applicable
to the case.  Willover v. State, 70 S.W.3d 841, 845 (Tex. Crim. App.
2002).  

2.         The Case Was Tried by Hearsay.

In issues thirteen and seventeen, appellant asserts
the trial court crafted an “investigator exception” to the hearsay rules, which
permitted DFPS workers and police investigators to tell jurors what they heard
from the children and other adults during their investigation.  “‘Hearsay’ is a
statement, other than one made by the declarant while testifying at the trial
or hearing, offered in evidence to prove the truth of the matter asserted.”  Tex. R. Evid. 801(d).  “Statements”
include oral and written verbal expressions and nonverbal conduct of a person
intended as a substitute for verbal expression.  Tex. R. Evid. 801(a).  

The State responds to these issues by asserting that
appellant failed to preserve these complaints.  The Court of Criminal Appeals
has stated that “we should avoid splitting hairs when determining whether a
claim has been procedurally defaulted.”  Keeter v. State, 175 S.W.3d
756, 760 (Tex. Crim. App. 2005).  To preserve error for appeal, a party needs to
“let the trial judge know what he wants, why he thinks himself entitled to it,
and to do so clearly enough for the judge to understand him at a time when the
trial court is in a proper position to do something about it.”  Id. 
Finally, although a party generally must preserve error by objecting each time
objectionable evidence is admitted, when a trial court has just overruled a
valid objection to the same testimony, a defendant is not required to
constantly repeat the objection.  Cardenas v. State, 787 S.W.2d 160, 162
(Tex. App.—Houston [1st Dist.] 1990, pet. ref’d).  

Appellant’s trial counsel made repeated and exhaustive
objections to this testimony, asserting it was hearsay; it violated the
Confrontation Clause; the prosecutor was leading the witness; the testimony
constituted improper bolstering; the witness lacked personal knowledge; the
witness was speculating; and the questions called for legal conclusions.  Other
than occasionally instructing the prosecutor to stop leading a witness, the
trial court repeatedly overruled these objections.  The appendix attached to
this opinion contains several excerpts of trial testimony, showing the type of
objections made and the trial court’s rulings on these objections.  As is made
clear by these excerpts, the trial court was not interested in entertaining
appellant’s hearsay objections.  Thus, appellant preserved these issues for our
review.

            The State also
responds that the trial court did not err by permitting DFPS workers and Kemp
to testify regarding what they heard from the children and adults during their
investigation because this testimony was admissible as “prior consistent
statements.”  Under Texas Rule of Evidence 801(e)(1)(B), statements that are
consistent with the declarant’s testimony and offered to rebut an express or
implied charge against the declarant of recent fabrication or improper
influence or motive are not hearsay.  Tex.
R. Evid. 801(e)(1)(B).  To fall within this hearsay exception, the prior
consistent statement must have been made before the improper influence or motive
arose.  See Haughton v. State, 805 S.W.2d 405, 407–08 (Tex. Crim.
App. 1990).  But the State acknowledges that appellant’s trial strategy was to
show that the Cantrells abused the children in their care and that, to divert
attention from their own wrongdoing, they pressured the children to falsely
accuse appellant.[17] 
Because appellant contends that those accusations—i.e., the children’s
outcries after being placed with the Cantrells—were the result of the Cantrells’
improper influence, a statement by one of the children could not be a prior consistent
statement unless it was made before the children began living with the
Cantrells.  Here, however, it is undisputed that none of Shannon and Holden’s
out-of-court statements characterized by the State as prior consistent
statements were made before the children were placed with the Cantrells.  Thus,
the repetition of these statements made by those other than the declarants
testifying at trial, which were offered for the truth of the matter asserted
therein, was quite clearly inadmissible hearsay.[18]  See Tex. R. Evid. 801(d).  As the excerpted
testimony in the appendix to this opinion demonstrates, numerous witnesses
testified regarding the statements the children had made to them (hearsay), as
well as statements made to them by other witnesses regarding what the children
had said to these other witnesses (hearsay within hearsay).  Appellant’s trial
counsel objected repeatedly to this testimony, yet the trial court repeatedly
overruled these objections.  

            The trial court
clearly abused its discretion in overruling appellant’s repeated hearsay
objections.  In so doing, these witnesses were permitted to repeat the
children’s allegations as facts; fill the gap left by the failure of Shannon
and Holden’s outcry witness, Margaret Cantrell, to testify; and describe the
sordid details of the alleged child sex ring as if they were personally aware
of it.  We therefore sustain appellant’s thirteenth and seventeenth issues.  

            3.         Hachtel
Was Not Qualified as an Expert.

In his fifteenth issue, appellant argues the trial
court permitted DFPS worker Kristi Hachtel to testify as an expert in violation
of Texas Rule of Evidence 702.  Specifically, appellant asserts that Hachtel
testified as an expert “in the fields of: (1) child sexual predator techniques,
and (2) determining the truthfulness of children’s sexual abuse allegations.” 
Rule 702 provides that “[i]f scientific, technical or other specialized
knowledge will assist the trier of fact to understand the evidence or to
determine a fact in issue, a witness qualified as an expert by knowledge,
skill, experience, training, or education may testify thereto in the form of an
opinion or otherwise.”  Tex. R. Evid. 702.

Before admitting expert testimony, a trial judge must
determine whether (1) the witness qualifies as an expert through knowledge,
skill, experience, training or education, (2) the subject matter of the
testimony is appropriate for expert testimony, and (3) admitting the
evidence will assist the finder of fact.  Vela v. State, 209 S.W.3d 128,
131 (Tex. Crim. App. 2006).  The State did not designate Hachtel as an expert.  Before
she testified, appellant sought a Daubert[19] hearing
on her qualifications to testify regarding the “grooming processs” used by
child predators.  The trial court denied this request.  Over appellant’s
objections that she was not qualified as an expert, Hachtel testified in detail
regarding the “grooming process” of child sexual predators and described
numerous medical details of child sexuality.

First, we note that Hachtel was a non-medical
witness.  Cf. Gregory v. State, 56 S.W.3d 164, 179–80 (Tex. App.—Houston
[14th Dist.] 2001, pet. dism’d) (stating that nurses and other medical
professionals may be qualified as experts in evaluating child abuse cases,
although a medical license or degree is not “the litmus test” for qualification
as an expert); Perez v. State, 25 S.W.3d 830, 837 (Tex. App.—Houston
[1st Dist.] 2000, no pet.) (concluding the trial court abused its discretion in
permitting non-medical witness to testify about findings made by pediatric
psychiatrist regarding “child abuse accommodation syndrome”).  During
cross-examination of Hachtel, appellant elicited the fact that Hachtel had not received
any training in psychology beyond an associate’s degree.  Hachtel agreed that
she was not a licensed professional counselor or psychologist, had not attended
medical school, and was neither a nurse nor a sexual assault nurse examiner.

Although Hachtel’s lack of medical training is not
dispositive of her qualifications to testify as an expert on the “grooming
process” used by child predators, her testimony was predicated on detailed
medical information.  For example, her testimony began as follows:

In girls, in what we call prepubescent girls, after the age
of 18 to 24 months, they lose the estrogen that was transferred to them through
birth.

And so in the vaginal area, the hymen, which is a circle of
tissue that surrounds the vaginal opening but does not cover, becomes very thin
and very tender to the touch. . . .  And the hymen is still like that until
estrogen comes back on board when a female child reaches menses or the time in
which she gets her menstrual cycle.

. . .

One of the things you have to know is that all the sexual
organs of both males and females is [sic] intact, even when they’re babies,
even when they’re two, three, seven, eleven.  The clitoris is intact.  It has
the same sensations as that of an adult female.

For the male, they can have an erection, the stimulation of
the glans in the head of a penis, the same sensations that a male would feel.

And although children don’t know that they have stimulation
of those sexual organs, that it’s called an orgasm, the sensations are still
the same.  There’s still that tingly feeling.  It’s a positive feeling.

Now that goes in contrary when the adult – others out there
go, oh, sexual abuse, that must be bad, painful.  That’s kind of in conflict,
because a perpetrator is grooming.  They will desensitize. 

Appellant’s trial counsel
renewed his objection to Hachtel’s testimony, arguing that she was “giving
testimony as if she were a physician,” and again requested a Daubert hearing. 
The trial court again denied this request, and there is absolutely nothing in
the record that indicates Hachtel has the training, background, knowledge,
experience, or education to provide such medical testimony.  Cf. Tex. R.
Evid. 702; Vela, 209 S.W.3d at 131.  Moreover, even if she were
qualified as an expert, it was not proper for her to testify that the victims
in this case were being truthful.[20] 
E.g., Lane v. State, 257 S.W.3d 22, 27 (Tex. App.—Houston [14th
Dist.] 2008, pet. ref’d) (“Because it is jurors who must decide the credibility
of the parties in issue, expert opinions on the truthfulness of a child
complainant’s allegations or that a class of persons the complainant belongs to
is truthful[] are prohibited.” (citing Yount v. State, 872 S.W.2d 706,
708, 710–12 (Tex. Crim. App. 1993) (op. on reh’g))).  

The trial court abused its discretion in allowing Hachtel
to testify as an expert.  We therefore sustain appellant’s fifteenth issue.  

4.         The Testimony of Appellant’s Expert Witness Was
Limited, but the Testimony of the State’s Expert Witness Was Not.

            In
his twenty-sixth and twenty-seventh points of error, appellant argues that the
testimony of his expert, Dr. Michael Ferrara, was restricted in violation of Texas
Rule of Evidence 704 and the Due Process Clause, while the testimony of the State’s
expert witness was not limited and other witnesses for the prosecution were
permitted to testify to the truthfulness of the children’s allegations.  Specifically,
appellant complains that his expert was not allowed to testify that the children’s
allegations were scientifically unreliable and that the allegations of abuse
were false.

            We have
previously held that no expert witness may testify that a child complainant’s
allegations are true.  E.g., id.  An expert witness also is
prohibited from testifying that a child’s allegations are false.  However, a qualified
expert may answer a hypothetical as to whether particular interviewing
techniques can lead to false accusations. 

            The trial court allowed
the State much more leeway in the examination of its own expert, Dr. Gayle
Burress.  It was error for the trial court to overrule an objection as to
whether the testimony of a child was “consistent with child abuse.”  It
was error for the judge to overrule an objection to a question as to “whether
there was grooming in this case.”  Both of those questions asked the expert to
give her opinion as to whether the testimony of the children was true.  See
id.  Certainly Dr. Burress could testify as to what constitutes “grooming,”
and she could answer a hypothetical as to whether showing masturbation
techniques with dolls is a type of grooming.  But the trial court should not
allow the prosecutor to testify and argue in his hypothetical.  For example,
the following question is a completely improper hypothetical and the court
should have sustained appellant’s objection:

In a hypothetical
case where children are forced to engage in sexual intercourse with one
another, where multiple children are forced to strip down and dance naked and
act out in sexual plays and fantasies . . . would you expect to see grooming?

And Dr.
Burress should not have been allowed to imply that the children were telling
the truth by claiming she would not have agreed to be a witness in the case if
she saw evidence of deception.  We therefore sustain appellant’s twenty-sixth
and twenty-seventh points of error.

            5.         These
Evidentiary Errors Caused Harm.

In determining harm in Harris v. State 790
S.W.2 586, 587–88 (Tex. Crim. App. 1989), the court concluded:

In
summary, a reviewing court in applying the harmless error rule should not focus
upon the propriety of the outcome of the trial.  Instead, an appellate court
should be concerned with the integrity of the process leading to the
conviction.  Consequently, the court should examine the source of the error,
the nature of the error, whether or to what extent it was emphasized by the
State, and its probable collateral implications. . .   [T]he reviewing court should
focus not on the weight of the other evidence of guilt, but rather on whether
the error at issue might possibly have prejudiced the jurors’ decision-making . . .  In other words, a reviewing
court must always examine whether the trial was an essentially fair one. 

Applying this test to the improperly admitted evidence here
leads us to the conclusion that harm occurred.  Although the children
themselves did testify regarding many of the same facts, allowing Kemp and the
DFPS witnesses to summarize their testimony and to testify as if they had
personal knowledge of the facts must certainly have influenced the jury in
their decision.  Appellant’s trial counsel was not permitted to adequately
defend appellant when his expert’s opinion was curtailed, while the State’s
expert was allowed to bolster the children’s testimony with her own opinion of
their truthfulness.  

F.        Violation of the
Confrontation Clause

1.         Testimonial Statements from
Absent Witnesses Were Improperly Admitted.

Appellant argues in his tenth, fourteenth, sixteenth,
and nineteenth issues that the trial court violated the Confrontation Clause
and Crawford v. Washington[21]
by permitting DFPS workers and Kemp to testify about statements made to them by
the children, their various foster parents, and other DFPS workers during their
investigations into the children’s allegations.  The Confrontation Clause of
the Sixth Amendment states, “In all criminal prosecutions, the accused shall
enjoy the right . . . to be confronted with the witnesses against him[.]”  U.S.
Const. Amend. VI.  The
Confrontation Clause is applicable to the states through the Due Process Clause
of the Fourteenth Amendment. Pointer v. Texas, 380 U.S. 400, 403–05 (1965).
 The primary concern of the Confrontation Clause is “to ensure the reliability
of the evidence against a criminal defendant by subjecting it to rigorous
testing in the context of an adversary proceeding before the trier of fact.”  Maryland
v. Craig, 497 U.S. 836, 845 (1990).  Even if a statement offered against a
defendant is admissible under evidentiary rules, the statement may implicate
the Confrontation Clause.  Gonzalez v. State, 195 S.W.3d 114, 116 (Tex. Crim.
App. 2006).  In brief, the Confrontation Clause bars the admission of
testimonial statements of witnesses who do not appear at trial, unless they are
unavailable to testify and the defendant had a prior opportunity for
cross-examination.  Crawford, 541 U.S. at 53–54.  

Much of the DFPS workers’ testimony concerned
information that clearly was learned from other sources.  For example, DFPS
worker Amy McDonald testified, over appellant’s hearsay and Confrontation
Clause objections, that she was “informed” by Shannon and Holden’s “foster
parents” that the children had watched movies with “naked people” in them.  McDonald
testified that there was a sexual incident between Holden and another boy at
his first foster home.  Yet Mr. Howard, the first foster father, did not
testify to this incident.  Likewise, appellant’s Confrontation Clause
objections to McDonald’s response to questions regarding whether she “learned”
through her investigation that appellant was involved in abusing the children
were overruled.  

DFPS witness Hunter testified to sexual acting-out in
the Cantrell’s home, including Cathy’s masturbation to the point of bleeding
and Shannon’s masturbation and over-sexualized behaviors with men. She could
have gained this information only from Margaret or John Cantrell.  She was
permitted to combine all of the children’s versions of events into a single
story, but some of the children did not make all these allegations.  She further
was permitted to testify that this was a “continuing pattern of sexual abuse”
perpetrated by the defendants. 

During the testimony of DFPS supervisor Hachtel, the
trial court overruled appellant’s objections to hearsay and violation of the
Confrontation Clause and allowed Hachtel to testify that Shannon’s “foster
parent” noted that Shannon had performed a type of strip tease dance.  No
foster parent testified in support of this statement.  Hachtel also testified,
over appellant’s Confrontation Clause objections, that once Shannon and Holden
began to “feel safe” they began making statements to their foster parents and
DFPS workers about their sister, Cathy.  It was undisputed that the first
outcry by Shannon and Holden occurred after they went to live with the
Cantrells.  And it is undisputed that the Cantrells did not testify.  Hachtel
testified that Cathy’s masturbation was excessive and abnormal for a five-year-old
and that she bled.  Again, this information was not based on anything that she
saw but could be based only on what Margaret Cantrell told her.  Hachtel
repeated the children’s stories as fact and identified appellant as part of a
child exploitation ring.

The DFPS witnesses repeatedly stated that Ginny did
not have contact with Shannon, Holden, and Cathy while they were at the
Cantrell home, yet Ginny’s story was consistent with theirs.  Hachtel testified
there was no contact at all between the children.  Hunter stated that they had
no contact until shortly before the first trial in March 2008.  This testimony
was not based on personal knowledge, and other testimony contradicted these
claims.  In November 2005, Ginny told her first foster mother that her
grandmother, Virginia Mayo, was lying about what had happened.  Ginny reported
that her grandmother said that Shannon, Holden, and Cathy had to dance in front
of boys at a strip club.  There was also a physical meeting of the children:  Ginny
had a play date with Shannon, Holden, and Cathy at the time of Ginny’s first
interview in August of 2006, when Ginny originally denied all allegations.  Sometime
later, she told her foster mother that everything that Shannon, Holden, and
Cathy said was true.  Clearly, someone was telling Ginny what Shannon, Holden,
and Cathy were saying.  Shannon also testified that she talked to Ginny on the
phone many times.  It was not until January or February of 2008 that Ginny
corroborated what the other children said. 

Kemp also testified at length regarding what he
“learned” through his investigation, i.e. that Cathy was masturbating excessively;
that Shannon and Holden’s sexual organs were in contact; and that appellant was
involved in criminal activity for profit with numerous other defendants. 
Appellant made frequent objections to this testimony, including multiple
objections to hearsay testimony and Confrontation Clause violations.  The trial
court overruled all these objections.

The State responds to these issues by asserting that
these statements were admissible as prior consistent statements.  First, many
of these “facts” did not come from the children and could not be prior
consistent statements.  Second, this response does not address appellant’s
complaints regarding violations of the Confrontation Clause.  See Gonzalez,
195 S.W.3d at 116 (Tex. Crim. App. 2006).  Third, as discussed above in section
III.D.2, statements by the children after they were placed with the Cantrells
do not qualify as prior consistent statements because appellant’s defensive
theory was that the Cantrells coached the children into making these allegations. 
The State further responds by asserting that appellant failed to preserve these
complaints.  But for the reasons discussed supra in section III.D.2, we
conclude these complaints were preserved.

In the face of appellant’s repeated Confrontation
Clause objections, it was the State’s burden to establish the statements were
admissible under Crawford.  See De La Paz v. State, 273 S.W.3d
671, 680–81 (Tex. Crim. App. 2008).  The State failed to do so at trial and has
failed to do so in its brief.

The hearsay repeated by Kemp and the DFPS workers was
collected as part of an investigation into the children’s allegations.  It is
difficult to see how these statements were not testimonial in nature.  Although
many of these witnesses may have testified at appellant’s trial,[22] neither
Margaret nor John Cantrell testified.  Several of the DFPS workers referred
simply to learning things from “foster parents,” without specifying from which
foster parents they learned the information, even in the face of appellant’s
Confrontation Clause objections.  Any information that these witnesses
discovered through interviews or conversations with the Cantrells should not
have been admitted without the State showing the Cantrells were unavailable and
that appellant had a prior opportunity to cross examine them.  See Crawford,
541 U.S. at 53–54.  Although the fact that the Cantrells asserted their Fifth
Amendment privileges obviated the need for the State to show that they were
unavailable, there is absolutely no showing in the record that appellant had a
prior opportunity to cross examine the Cantrells.  

In sum, we conclude that, in the face of repeated
objections based on the Confrontation Clause, the trial court did not act to
ensure that appellant’s right to confront the witnesses against him was
protected.  “Where testimonial statements are at issue, the only indicium of
reliability sufficient to satisfy constitutional demands is the one the
Constitution actually prescribes:  confrontation.”  Id. at 68–69.  We
thus sustain appellant’s tenth, fourteenth, sixteenth, and nineteenth issues.

2.         Violations of the Confrontation Clause
Harmed Appellant.

The
violation of a defendant’s right of confrontation is subject to a
harmless-error analysis.  Delaware v.
Van Arsdall, 475 U.S. 673, 681 (1986).  We must reverse the conviction unless we determine beyond
a reasonable doubt that the error did not contribute to it.  Tex. R. App. P. 44.2(a).  As detailed above, the emphasis of a harm analysis is not the
propriety of the trial’s outcome but the integrity of the process that led to
the conviction.  Harris,790 S.W.2d at 587. 

When evaluating harm, we consider:  (1) the statement’s importance
to the State’s case; (2) whether the statement was cumulative of other
evidence; (3) the presence or absence of evidence corroborating or
contradicting the statement on material points; and (4) the overall strength of
the State’s case.  Scott v. State, 227 S.W.3d 670, 690 (Tex. Crim. App. 2007).  We may also consider the source and nature of the error,
the amount of emphasis by the State on the statement, and the weight that a
juror would probably give it.  Id.  Finally,
we presume that the damaging potential of any cross-examination would have been
fully realized had the witness been present to testify.  Baldree v.
State, 248 S.W.3d 224, 231 (Tex. App.—Houston [1st Dist.] 2007, pet. ref’d).

As discussed above, much of the hearsay
information had to have come from the Cantrells; the Cantrells believability
was essential to the State’s case; and the defense was prevented from presenting
appellant’s defensive theory about the Cantrells.  These factors lead us to the
inevitable conclusion that harm resulted from these violations of appellant’s
right to confront the witnesses against him.

IV.  Conclusion

Although the evidence in this case is legally
sufficient to support appellant’s conviction, the record is rife with error. 
We have sustained appellant’s complaints that he was prevented from presenting
his defense, and we cannot conclude, beyond a reasonable doubt, that these
errors did not contribute to appellant’s conviction.  We have further concluded
that many of appellant’s other complaints are meritorious.  In fact, our review
of the record supports appellant’s contentions that the trial court adopted ad
hoc evidentiary rules that operated to assist the State in proving its
case, while impeding appellant’s ability to defend himself.  Many of these
errors did affect appellant’s substantial rights.  For the foregoing reasons,
we reverse and remand for a new trial.  

                                                                                    

 

                                                                        /s/        Tracy
Christopher

                                                                                    Justice

 

Panel consists of Chief Justice Hedges
and Justices Anderson and Christopher.

Publish
— Tex. R. App. P. 47.2(b).








APPENDIX: 
EXCERPTS FROM RECORD[23]

Direct
Examination of Amy McDonald, Smith County DFPS Employee, not designated as an
outcry witness

Q.        What types of
issues were arising at the foster home?

A.        Just a few
days after placement, there was an incident between [Holden] and the other
little boy that lived in the foster family’s home.

            MR.
DAVIDSON:  Objection, hearsay; lack of personal knowledge.

            THE COURT: 
The objection is overruled.

Q.        (By Mr.
Murphy)  Was that incident sexual in nature.

A.        Yes.

On re-direct:

Q.        (By Mr.
Murphy) Based on your training and experience, based upon your involvement in
this case, is there any doubt in your mind about the defendant’s culpability?

MR.
DAVIDSON:  Objection, calls for speculation and also lack of personal knowledge.

THE
COURT:  Overruled.

A.        Sorry.  Can
you ask the question --

Q.        (By Mr.
[Murphy])  Is there any doubt in your mind that -- just as Jamie Pittman and
Shauntel Pitman (sic) have been found guilty by a jury, is there any doubt in
your mind that the defendant is also just as guilty as they are?

A.        No.

Q.        No, he is
not, or, no, there’s no doubt in your mind?

A.        No doubt in
my mind.


Direct
Examination of Alexia Hunter, Smith County DFPS Caseworker, not designated as an
outcry witness

Q.        Why did if
give you concern -- when [Cathy] started talking about wearing costumes
and dancing and jumping, why did that give CPS concern?

A.        [Shannon] had
already started to give information that the children --

            MR.
DAVIDSON:  Objection, hearsay, Your Honor; objection, violation of the
confrontation clause.

            THE
COURT:  Both of those objections are overruled.

            Go
ahead, ma’am.

A.        Okay.  That
the children were given costumes of what she described as a panty and bra set
and allowed -- made to dance on a stage.

            MR.
DAVIDSON:  Your Honor, I have to raise the same objections again.  I can ask
for a running objection.

            THE
COURT:  The same ruling by the Court, and I’ll give you a running objection as
to this witness so she can go ahead with her testimony.

Q.        (By Mr.
Murphy)  Go ahead.

A.        [That] she
was made to dance for money.

MR. DAVIDSON:  Same
objection, Your Honor.

THE COURT:  Do
you want the running objection or - -

MR. DAVIDSON:  I
have -- I think I have to keep repeating.

THE COURT:  Your
objections are all overruled.

Go ahead, ma’am.

A.        And at that
time, she had already started to give the information about having to wear the
costumes and the costumes had been burned.

MR. DAVIDSON:  Objection,
violation of confrontation clause against my client, Article I, Section 10 of
the Texas Constitution, Sixth Amendment of U.S. Constitution, and hearsay
without exception.

THE COURT:  All
of those objections are overruled, Mr. Davidson.

.
. .

Q.        (By Mr.
Murphy)  Ms. Hunter, you said that there were concerns because of allegations --
or excuse me -- because of what [Shannon] was beginning to say regarding
dancing and costumes.

A.        Correct.

Q.        Were y’all
given information as to what happened to those costumes?

A.        Yes.

            MR.
DAVIDSON:  Objection, hearsay; violation of the confrontation clause.

            THE
COURT:  Those objections are overruled.

Q.        (By Mr.
Murphy)  What happened to those costumes?

            MR.
DAVIDSON:  Lack of personal knowledge on the part of this witness.

            THE
COURT:  That objection is overruled.

Q.        (By Mr.
Murphy)  What happened to those costumes?

A.        [Shannon]
stated they were burned.

Q.        And did she
tell y’all where they were burned?

A.        Yes.

Q.        Where were
they burned?

            MR.
DAVIDSON:  Objection, again, Your Honor.  I have to raise the same objections. 
This is hearsay without exception.

            THE
COURT:  Same ruling by the Court.

Q.        (By Mr.
Murphy)  Where were they burned?

A.        They were
burned on Mr. Kelly’s property.

.
. .

Q.        Now, was
there any -- once they were in the Cantrells’ home talking about all
three of them together now --

A.        Okay.

Q.        -- was
there any sexual acting out within the Cantrells’ home?

MR. DAVIDSON:  Objection,
lack of personal knowledge; objection, calls for speculation; objection,
violation of confrontation clause, U. S. Sixth Amendment, Article I, Section
10, Texas Constitution.

THE COURT:  Same
ruling by the Court.  Overruled.

A.        Yes.

Q.        (By Mr.
Murphy)  Let’s start with [Cathy]. What type of sexual acting out was [Cathy]
doing in the Cantrell home?

A.        [Cathy] was
masturbating to the extent of bleeding.

Q.        Would she do
this frequently?

A.        Yes.

Q.        Would she do
it just about everywhere?

MR. DAVIDSON:  Objection,
leading.

THE COURT:  Sustained.
Don’t lead the witness.

Q.        (By Mr.
Murphy)  What types of places would [Cathy] masturbate?

A.        [Cathy] would
masturbate at home.

Q.        Would she
ever masturbate, to your knowledge --

MR. DAVIDSON:  Objection,
leading again, Your Honor.

MR. MURPHY:  I’m
sorry, Judge, but I’m not finished with my question.

THE COURT:  I
know. Go ahead and finish it.

Q.        (By Mr.
Murphy)  To your knowledge, would she masturbate anywhere other than the home?

A.        No.

Q.        How old was
[Cathy]?

A.        [Cathy] was
five.

A.        Why is it
that -- a five-year-old who would masturbate until she bled, what about
that gave you concern?

MR. DAVIDSON:  Objection,
Your Honor, calls for speculation.  Neither has this witness been qualified as
a medical expert or a psychological expert in the treatment of kids.

THE COURT:  All
those objections are overruled.

You can answer
the question, ma’am.  Go ahead.

A.        Rephrase the
question.

Q.        (By Mr.
Murphy)  What is it about a five-year-old girl who says that she wears costumes
and jumps up and down and people get money when she’s first placed in her first
foster home?

MR. DAVIDSON:  Objection,
leading, Your Honor.

THE COURT:  That
objection is overruled.

Q.        (By Mr.
Murphy)  What about her masturbating until she bled gave you concern?

A.        The extent of
the masturbation was the concern.  Most children masturbate but not to the
extent of bleeding.

Q.        What about
[Shannon]?  Did she act out sexually in any way?

A.        [Shannon]
would also masturbate, but she had extreme --

MR. DAVIDSON:  Objection,
lack of personal knowledge; calls for speculation; witness is not qualified as
an expert.

THE COURT:  Those
objections are overruled.

Go ahead and
start your answer again.  Just start over.  Thank you.

THE WITNESS:  Okay.

A.        [Shannon]
would masturbate as well, and she also had very over-sexualized behaviors
toward adult men.

Q.        What do you
mean by that?

A.        She would
just come and sit in their laps, someone that she just met that day.  She would
swing her hair and just get really close to adult men, make them rather
uncomfortable.

.
. .

Q.        As time went
on, were you made aware as to whether or not Patrick “Booger Red” Kelly was
involved in this abuse?

MR. DAVIDSON:  Objection,
lack of personal knowledge; calls for speculation; calls for hearsay; also,
violation of confrontation clause, Sixth Amendment of the U.S. Constitution,
Article I, Section 10, Texas Constitution.

THE COURT:  Those
objections are overruled.

Ma’am,
you may answer the question.

A.        Yes.

Q.        (By Mr.
Murphy)  When we say involved, what’s kindergarten?

MR. DAVIDSON:  Objection,
lack of personal knowledge, Your Honor.

THE COURT:  The objection
is overruled, Mr. Davidson.

Ma’am, go ahead
and answer the question.

A.        Kindergarten
is a time where the children are trained by the adults how to perform the
sexual dancing and the sexual acts starting at age five.

Q.        (By Mr.
Murphy)  From your knowledge of this case, was Booger Red involved in
kindergarten?

A         Yes.

MR. DAVIDSON:  Objection,
lack of personal knowledge; also violation of confrontation clause against my
client; also calls for hearsay.

THE COURT:  Those
objections are all overruled.

Q.        (By Mr.
Murphy)  After kindergarten, that included but it wasn’t limited to him, was
it?

A.        No.

Q.        After that,
where would the kids go?

A.        They would
dance on stage.

MR. DAVIDSON:  Your
Honor, objection, lack of personal knowledge by this witness. 

 Number two,
objection, calls for speculation by this witness.

Number three,
repetitive testimony.

Number four,
this would be in violation of the confrontation clause, Sixth Amendment, U.S.
Constitution; Article I, Section 10 of the Texas Constitution.

THE COURT:  Those
objections are overruled.

You may answer
the question.

 A.       They would be
-- they would dance on stage.  [Shannon] would dance with her mother.

MR. DAVIDSON:  Your
Honor, objection.  This is improper bolstering of previous child testimony.




 

MR. MURPHY:  Judge,
it’s a prior consistent statement.

THE COURT: 
Overruled.

A.        She would
dance with her mother and another woman that she said has dark brown hair. 
[Holden] would be made -- they would be made to play doctor.

Q.        (By Mr.
Murphy)  [Holden] and [Shannon]?

A.        [Holden] and
[Shannon].

 MR. DAVIDSON:  Your
Honor, I have to object.  This is a violation of the confrontation clause,
Sixth Amendment, U.S. Constitution; Article I, section 10, Texas Constitution.

This witness has
no personal knowledge of this.  This witness is testifying about events that
she has not personally seen or witnessed or knows about.  It’s a violation of
the confrontation clause.

THE COURT:  All
of those objections are overruled.

.
. .

Q.        They would
play -- I believe your testimony was that they would play doctor,
[Holden] and [Shannon].

A.        Correct.

Q.        Siblings?

A.        Yes.

Q         Did doctor
include their privates touching one another?

A.        Yes.

Q.        The whole
time they were being brought to that club, did they reside here in Tyler?

A.        Yes.

Q.        So they were
leaving Tyler after kindergarten to go to the club

MR. DAVIDSON:  Your
Honor, objection, lack of personal knowledge on the part of this witness.

And, number two,
calls for speculation on the part of this witness.

Number three,
violation of the confrontation clause on both the Sixth Amendment of the U.S.
Constitution and Article I, Section 10 of the Texas Constitution.

THE COURT:  Same
ruling by the Court on all the same objections.

Q.        (By Mr.
Murphy)  So they were brought from Tyler, Smith County, Texas, to that club to
perform?

A.        Correct.

Q.        What would
the kids get for performing?

A.        Food.

MR. DAVIDSON:  Again,
Your Honor, lack of personal knowledge.

THE COURT:  Same
ruling by the Court.  Overruled.

Q.        (By Mr.
Murphy)  I’m going to lump them all together. What would the grownups get?

MR. DAVIDSON:  Again,
Your Honor, objection, lack of personal knowledge; calls for hearsay; violation
of the confrontation clause.

THE COURT:  Overruled.

Q.        (By Mr.
Murphy)  What would the grownups get?

A.        Money.

Q.        When we say
“the grownups,” does that group include Patrick “Booger Red” Kelly?

MR. DAVIDSON:  Your
Honor, objection, leading; and also calling for -- this lack of personal
knowledge on the part of the witness; calls for speculation about --
from the witnesses; and finally hearsay.

THE COURT:  All
those objections are overruled, except to the leading.  

Don’t lead her,
Mr. Murphy.

MR.
MURPHY:  Yes, sir.

Q.        (By Mr.
Murphy)  Was Patrick “Booger Red” part of that group?

A.        Yes.

Q.        Was Jamie
Pittman part of that group?

A.        Yes.

Q.        Was Shauntel
Mayo part of that group?

A.        Yes.

MR. DAVIDSON:  Objection,
leading, Your Honor.

THE COURT:  Overruled.

Q.        (By Mr.
Murphy)  Was Dennis Pittman part of that group?

A.        Yes.

A.        Was Jimmy
Sones part of that group?

Q.        Yes.

MR. DAVIDSON:  Objection,
lack of personal knowledge on the part of this witness to any of the questions
that the District Attorney just asked this witness.

THE COURT:  Same
ruling by the Court as on all your other objections, Mr. Davidson. They’re
overruled.

Q.        (By Mr.
Murphy)  And was Sheila Sones part of that group?

A.        Yes.

Q.        Based on your
knowledge and CPS involvement in this case, was this a continuing course of
sexual abuse?

MR. DAVIDSON:  Objection,
calls for speculation.  Also asks this witness to make a legal opinion, which
she is not qualified to do. She’s not a lawyer, and she’s not a judge.

THE COURT:  That
objection is overruled.

Q.        (By Mr.
Murphy)  Was this a continuing pattern of sexual abuse on [Shannon], [Holden],
and [Cathy] --

MR. DAVIDSON:  Objection,
leading.

THE COURT:  Overruled.

Q.        (By Mr.
Murphy) -- perpetrated by the defendant in the group that we just named?

A.        Yes.

…

Q.        From the time
they were removed -- from the time [Shannon] and [Holden] were removed
from Shauntel and Jamie Pittman’s house up until recently, did they have any
contact with [Ginny]?

A.        No.

MR. DAVIDSON:  Objection,
lack of personal knowledge on the part of this witness; calls for speculation;
calls for hearsay.

THE COURT:  Overruled.

You can answer the
question.

A.               
No,
they did not.

 

…

 

Q.        (By Mr.
Murphy)  Did [Ginny] also give CPS a version of the events as to what occurred
not only in kindergarten but also the Mineola swingers’ club?

A.        Yes.

Q.        Was her
version of events consistent with what [Shannon], [Holden], and [Cathy] said?

MR. DAVIDSON:  Objection,
Your Honor.  Lack of personal knowledge on the part of this witness; violation
of confrontation clause; calls for hearsay.

THE COURT:  It’s
all overruled.

[No
answer]

Q.        Was there any
influence by one group or the other in this case?

MR. DAVIDSON:  Objection,
calls for speculation on the part of the witness; objection, lack of personal
knowledge on the part of witness; objection, violation of the confrontation
clause against Patrick Kelly, Sixth Amendment, U.S. constitutional right, and
Article I, Section 10 of the Texas Constitution.

THE COURT:  The
objections are overruled.

You
may answer the question.

A.        No.  Not to
my knowledge, no.

Q.        (By Mr.
Murphy)  Do you think this is just a false allegation?

A.        No, I do not.

Q.        Is there any
doubt in your mind about that?

A.        No.




 

Direct
Examination of Kristi Hachtel, DFPS Supervisor, not designated as an outcry
witness

Q.        (By Mr.
Murphy)  What types of red flags did y’al1 notice with [Shannon] before her
outcries?

A.        That she
would hush [Holden] up if he was talking and tell him that “we don't talk about
that.”  When she was in the foster home and doing a princess dance --

MR. DAVIDSON:  Your
Honor, again, objection, hearsay, lack of personal knowledge on the part of
this witness.

THE COURT:  That’s
the same objection I already ruled on.  If there’s any question about it, it’s
overruled again.

Go
ahead.

Q.        (By Mr.
Murphy)  What about the princess dance was a red flag?

A.        What the
foster parent noted was that while the other girls were pretending to be a
princess and do ballet, [Shannon] had adjusted her --

MR. DAVIDSON:  Your
Honor, objection, again, hearsay, violation of the confrontation clause.

THE COURT:  Here’s
the way we’re going to do it, Mr. Davidson.

MR. DAVIDSON:  Yes,
sir.

THE COURT:
You’re constantly interrupting the witness.  I want you to have every
opportunity to object.  If you’ll go ahead and lodge your objection after Mr.
Murphy asks the question, then I’ll rule on the objection.

Unless it gets
in some area beyond that question, you know, the witness needs to be able to
finish her testimony.  You can object whenever you want to, but if I overrule
the objection and then allow her to answer the question, then unless it goes
into some totally different area where I have not already ruled, she needs to
be able to finish her answer.  But you object whenever you want to.

MR. DAVIDSON:  Yes,
sir.

THE COURT:  Go
ahead, Mr. Murphy.

Q.        (By Mr.
Murphy)  What about the princess dance was the red flag based on your training
and experience?

MR. DAVIDSON:  Objection,
Your Honor. At this time, the witness has no personal knowledge.  The witness
did not witness this.  This is calling for hearsay, speculation, and violation
of confrontation clause.

THE COURT: Those
objections are all overruled.  Let’s see if we can go ahead now -- all
the objections are overruled.

Q.        (By Mr.
Murphy)  What part about the princess dance was a red flag based on your
training and experience?

A.        She had gone
into a repertoire that was consistent with a striptease or pole dance.

Q.        How old was
she?

A.        I believe she
was seven.

Q.        Was that the
only time she went into that striptease -- excuse me -- or pole
dance routine?

MR. DAVIDSON:  Your
Honor, objection.  Same objections that I just made previously.

THE COURT:  Same
ruling by the Court, Mr. Davidson. They’re overruled.

A.        I’m aware of
only that one.

. . .

Q.        (By Mr.
Murphy)  You talked about [Cathy]’s masturbation.  I guess for lack of a better
term, was that a normal exploration by a five-year-old of their own body?

A         No. 

Q         Why do you
say that?

A         Most
children, in normal exploration of their own body, will have clothes on, and
they figure out they’ve got body parts down there, and those body parts have
some feelings, so there will be some light stroking.  They may ask you about
it.

When
a child will disrobe and make gestures to accurately place fingertips or other
objects directly on the clitoris and do larger stimulation, that is not normal.
 That’s beyond what is a normal kid figuring out that they have body parts and
what those body parts are.  It’s much more than an exaggerated stimulation.

Q.        How would you
describe [Cathy]’s masturbation?

MR. DAVIDSON:  Again,
Your Honor, objection, lack of personal knowledge on the part of this witness.

THE COURT:  The
objection is overruled.

A.        Excessive.

Q.        (By Mr.
Murphy)  Why would you describe it as excessive?

A         Because it
was all the time most -- it was all the time.  I mean, most kids, maybe
when they’re taking a bath or they’ve got their jammies on or their little gown
on, you know, sitting there watching TV, and, wow, it’s there.

It
was all the time.  It was -- it was not normal.  It was all the time.  It
was excessive.  It was out in public.  It was -- this isn’t something
private that I’m going to do behind closed -- you know, behind --
or when I’m in my bed or something like that.

It
was -- it’s the only way I can say it was all the time.

Q.        Did she ever
masturbate until she bled?

MR. DAVIDSON:  Objection,
leading.

THE COURT:  Overruled
as to that question.

A.        Yes.

Q.        (By Mr.
Murphy)  Is that normal for a five-year-old?

A.        I don’t think
it’s normal for anybody.

Q.        And based on
your training and experience, is that learned behavior?

A.        Yes, sir.

Q.        Based on your
training and experience, where did she learn this behavior?

MR. DAVIDSON:  Objection,
calls for speculation on the part of the witness, and the witness has no
personal knowledge. 

THE COURT:  I’ll
sustain that objection.

You can rephrase
that question, Mr. Murphy.

Q.        (By Mr.
Murphy)  Through your CPS investigation, was [Cathy] taught this behavior?

A.        Yes, sir.

Q.        Based on your
CPS investigation that you supervise, who taught [Cathy] this behavior?

MR. DAVIDSON:  Again,
same objection that I just made, Your Honor.

THE COURT:  Same
ruling by the Court, overruled.

A.        [Cathy] was
in a child sexual exploitation ring and was taught by Jamie Pittman, Shauntel
Mayo, Booger Red, Mr. Patrick Kelly, and Dennis Pittman.

.
. .

Q.        Anything that
-- let’s start with [Shannon].  Anything that [Shannon] told you or
other CPS workers or that you’re aware of, were you concerned about the
veracity of that at all?

A.        No.

Q.        What about
[Holden] or [Cathy]?

A.        None.

Q.        Are you aware
as to whether or not [Ginny] made any outcries?

A         Yes, I am.

Q         And did those
outcries also validate [Holden], [Shannon], and [Cathy]?

A         Yes, they do.

Q         And they had
no contact either?

A.        None.

…

Q.        Ms. Hachtel,
do you believe it happened?

A.        Everything in
my body says it happened.

Q.        Do you
believe that Patrick “Booger Red” Kelly was involved?

A.        Directly
involved.

Q.        As was Jamie
Pittman and Shauntel Mayo?

A.        Yes, sir.

Q.        What about
Dennis Pittman?

A.        Actively
involved.


Direct
Examination of Phillip Kemp, Texas Range, not designated as outcry witnessr

Q.        We have
talked about [Shannon].  Did she have any behaviors that were indicators of
sexual abuse?

MR. DAVIDSON:  Your
Honor, objection, lack of personal knowledge; lack of qualifications.

This person is
not a psychologist, a licensed professional counselor, or psychiatrist, SANE
nurse, M.D., or child expert.

THE COURT:  That
objection is overruled.

MR. DAVIDSON:  Objection,
also calls for hearsay; violation of confrontation clause.

THE COURT:  Those
are overruled, too.

A.
       I believe so, yes

.
. .

Q.        Before we get
any further, were any threats made against [Shannon] regarding what would
happen to her if she told anybody what had happened?

MR. DAVIDSON:  Objection,
leading; objection, lack of personal knowledge; objection, hearsay; and
objection, violation of confrontation clause.

THE COURT:  Those
objections are overruled.

A.        Yes. . . . 

I’m
not able to recall what specific threat was, but I do remember that it was at
Vacation Bible School, at least one of them was at the Vacation Bible School.

MR. DAVIDSON:  Your
Honor, objection, same objections I made before.  Number one, hearsay; lack of
personal knowledge; violation of confrontation clause.

THE COURT:  Same
ruling by the Court.  They’re overruled.

Q.        (By Mr.
Murphy) Was [Shannon] able to tell you who hurt her?

MR. DAVIDSON:  Same
objections, Your Honor.

THE COURT:  Same
ruling.

A.        Yes, sir.

Q.        Did she tell
you who made her do all of this?

MR. DAVIDSON:  Objection,
calls for hearsay; calls for violation of confrontation clause; lack of personal
knowledge.

THE COURT:  Objection
is overruled.

A.        Yes, sir, she
did.

Q.        (By Mr.
Murphy)  Who?

A.        Jamie
Pittman, Sheila Sones.

MR. DAVIDSON:  Your
Honor, again, I need to renew my running objection at this time.

THE COURT:  It’s
there.

MR. DAVIDSON:  Thank
you.

A.        Shauntel
Mayo, Jimmy Sones, Patrick Kelly, Dennis Pittman.

.
. .

Q.        (By Mr.
Murphy)  When you talked to [Shannon], is there anything that she told you that
gave you any type of concern about her fabricating or making up what she told
you?

MR. DAVIDSON:  Your
Honor, objection, leading; objection, calls for hearsay; objection, violation
of the confrontation clause; Sixth Amendment U.S. Constitution; Article 1,
Section 10, Texas Constitution.

THE COURT:  All
of those objections are overruled.

A.        There
was no concerns.

.
. .

Q.        (By Mr.
Murphy)  Were they able to tell you who all was involved -- what all
adults, excuse me -- were involved in kindergarten?

A.        Yes, sir.

Q.        Who were
those adults?

A.        One was
Patrick Kelly.

MR. DAVIDSON:  Your
Honor, again, objection. Same objections I just made:  Confrontation clause,
hearsay, lack of personal knowledge.

THE COURT:  They’re
on the record. Same ruling by the Court.

A.        One was
Patrick Kelly.  It was conducted at his residence.  Two was Shauntel Mayo,
Jamie Pittman, Jimmy Sones.

.
. .

Q.        What would
they do at the club?

A.        They would
perform sex acts.  These acts would be videotaped

MR. DAVIDSON:  Objection,
calls for hearsay; lack of personal knowledge; calls for speculation;
objection, violation of confrontation clause, U. S. and Texas Constitutions.

THE COURT:  All
of those objections are overruled.

A.        They would
perform sex acts.  These acts would be videotaped.  And they would also perform
live in front of paying customers.

Q.        (By Mr.
Murphy)  These sex acts -- based on your investigation, did [Holden] and
[Shannon] ever engage in any of these sex acts?

MR. DAVIDSON:  Your
Honor, objection, calls for speculation; lack of personal knowledge; hearsay;
and violation of confrontation clause, U.S. Constitution and Texas
Constitution.

THE COURT:  Those
objections are overruled.

A.        Yes, they
did.

Q.        (By Mr.
Murphy)  When engaged in these sex acts -- I’m not going to get in
detail with you; they might, but I’m not going to -- did their privates
touch each other?

A.        Yes, sir.

MR. DAVIDSON:  Same
objections, Your Honor.

THE COURT:  Same
ruling.

Q.        (By Mr.
Murphy)  Who benefited from [Shannon] and [Holden] performing sex acts on one
another?

MR. DAVIDSON:  Objection,
Your Honor, relevancy, number one; number two, lack of personal knowledge;
number three, calls for hearsay; calls for speculation; and number five,
violation of confrontation clause, U.S. and Sixth Amendment and Texas
Constitutions.

THE COURT:  Overruled.

A.        Everyone
involved in the club.

Q.        (By Mr.
Murphy)  Does that include, but not limited to, the defendant, Patrick “Booger
Red” Kelly?

A.        Yes, sir.

Q.        How did they
benefit?

MR. DAVIDSON:  Objection
again, Your Honor, hearsay; speculation; lack of personal knowledge; violation
of the confrontation clause.

…

 (At the bench, on the
record.)

…

MR. MURPHY:  I’m
just saying – I’m sorry, Judge. I’m just saying, obviously, these are prior
consistent statements; obviously, they are admissible.  And I guess if he wants
to object to every question, he can.

For the record,
I want to put in the reason for me asking these questions.  They are prior
consistent statements.

THE COURT:  I
understand.

MR. DAVIDSON:  Which
he did not personally observe.  Hearsay.

THE COURT:  That’s
right.  He wasn’t in the club.  That’s right.  I’m overruling.  I’ve made my
ruling.  I’ve overruled your objections.

…

Q.        (By Mr.
Murphy)  How did they benefit?

A.        Monetarily.

Q.        When I say
“they,” does that include, but not limited to, the defendant?

A.        Yes, sir.

Q.        Other than
[Holden] and [Shannon], did you ever talk to [Cathy]? 

A.        Yes, I did.

Q.        Now, had
[Cathy] always been with [Shannon] and [Holden]?

MR. DAVIDSON:  Objection,
leading,  Your Honor; also, objection, lack of personal knowledge; calls for
speculation.

THE COURT:
Objections are overruled.

A.        No
sir, she was not.

.
. .

Q.        Are you aware
of the reason for her being reunited with them?

A.        Allegations
she had made an outcry of possible sexual abuse as well and was removed.

MR. DAVIDSON:  Objection,
calls for speculation; lack of personal knowledge; calls for hearsay; violation
of confrontation clause.

THE COURT:  Okay.
 Well, he’s answered the question.  The objections are overruled.

Q.        (By Mr.
Murphy)  Briefly talking about [Cathy], did [Cathy] exhibit any signs of sexual
abuse?

A.        Yes.

MR. DAVIDSON:  Objection,
calls for speculation; hearsay; lack of personal knowledge.

THE COURT:  Objections
are overruled.

Restate that
question, Mr. Murphy.

Q.        (By Mr.
Murphy)  What were those signs?

A.        She was, at
various points, including currently, in the past few months, still
masturbating.

Q.        How would you
describe her masturbation?

MR. DAVIDSON:  Objection,
Your Honor, lack of personal knowledge.  This witness did not observe anything
like that.  This calls for rampant speculation; also, hearsay; violation of
confrontation clause.

THE COURT:  Those
objections are overruled.

Could you keep
your voice up, Ranger Kemp, please?

Q.        (By Mr.
Murphy)  How would you describe her masturbation?

A.        Well, first
of all, she would, for lack of a better term, hump the laundry, and she would
also masturbate to the point of causing herself to bleed.

MR. DAVIDSON:  Your
Honor, I have to renew the same objections that I just made a few seconds ago.

THE COURT:  Same
ruling by the Court .

.
. .

Q.        (By Mr.
Murphy)  Did [Cathy] ever tell you if anybody hurt her?

A.        Yes, sir.

Q.        Who did she
say hurt her?

MR. DAVIDSON:  Your
Honor, objection, hearsay.

THE COURT:  Objection
is overruled.

MR. DAVIDSON:  Violation
of the confrontation clause.

THE COURT:  That’s
overruled, too.

A.
       The ones that were instructing her.

.
. .

Q.        Did [Alicia]
talk about being sexually abused?

MR. DAVIDSON:  Your
Honor, objection, leading.

THE COURT:  Objection
is overruled.

A.        Yes, sir, she
did.

Q.        (By Mr.
Murphy)  Did [Alicia] include the defendant, Patrick “Booger Red” Kelly, as one
of those individuals who abused her?

MR. DAVIDSON:  Objection,
Your Honor.  This calls for hearsay; it calls for speculation; and it also
calls for a violation of the confrontation clause.

THE COURT:  Those
are all overruled.

A.        I
don’t recall if she talked about him or not.

.
. .

Q.        When you were
investigating this offense, were you able to determine, first of all, whether
or not a group of people collaborated in carrying out these offenses for their
own monetary gain?

 MR. DAVIDSON:  Objection,
leading question; narrative question. The prosecutor is testifying.

THE COURT:  Those
objections are overruled.

MR. DAVIDSON:  Your
Honor, objection.  Again, this question calls for a legal conclusion by a
person who is not a lawyer or a judge.

THE COURT:  Those
objections are overruled.

.
. .

Go ahead and
restate the question, Mr. Murphy.

Q.        (By Mr.
Murphy)  Through the course of your investigation, were you able to determine
whether or not a group of individuals were involved in collaborating  and
carrying out the criminal activity that we’ve talked about?

A.        Yes, sir.

Q.        Did they do
so for their own monetary gain?

MR. DAVIDSON:  Objection,
Your Honor.  Calls for hearsay; speculation; lack of personal knowledge;
violation of the confrontation clause. 

THE COURT:  Same
ruling by the Court, overruled.

A.        Yes, sir.

Q.        (By Mr.
Murphy)  When talking about the criminal activity, does that criminal activity
include, but not limited to, [Holden] and [Shannon] playing doctor together?

MR. DAVIDSON:  Your
Honor, objection.  Leading question; lack of personal knowledge; calls for
speculation; violation of the confrontation clause; U.S. Sixth Amendment;
Texas, Article 1, Section 10.

THE COURT:  Those
objections are overruled.

Q.        (By Mr.
Murphy)  Playing doctor -- through your investigation, was playing
doctor, did it involve the private parts, the male and female genitalia, to
touch one another?

MR. DAVIDSON:  Again,
Your Honor, objection, lack of personal knowledge; calls for hearsay; calls for
violation of the confrontation clause; U.S. Sixth Amendment; Article 1, Section
10, Texas Constitution.

THE COURT:  All
of those objections are overruled.

You need him to
rephrase that question -- rephrase it?

THE WITNESS:  No,
sir.

THE COURT:  You
got it?

THE WITNESS:  Yes,
sir, I did.

[No
answer]

Q.        (By Mr.
Murphy)  When we talk about that group, was Patrick Kelly in that group?

MR. DAVIDSON:  Same
objections, Your Honor.

THE COURT:  Same
ruling, Mr. Davidson.

A.        Yes, sir.

Q.        (By Mr.
Murphy)  Is there anything about your two-year investigation that gives you
pause or concern as to the veracity of what those children say?

A.        No, sir.

.
. .

Q.        (By Mr. Murphy) 
Through the course of your investigation, were you able to determine what
happened to them [the videotapes]?

A.        They were
destroyed.

Q.        Where were
they destroyed?

MR. DAVIDSON:  Objection,
lack of personal knowledge; calls for speculation. 

THE COURT:  If
it’s based on his investigation, he can answer.

A.        At Patrick
Kelly’s residence.

Q.        (By Mr.
Murphy)  The defendant, Booger Red’s house?

A.        Yes, sir.

Q.        Which is here
in Smith County?

A.        Yes, sir.

Q.        What county
would the children leave -- when I talk about the children specifically,
[Shannon] and [Holden] -- what would they leave in order to go to
swingers’ club?

MR. DAVIDSON:  Your
Honor, objection.  This is a grotesquely leading question; calls for
speculation; and lack of personal knowledge of the witness.

THE COURT:  The
Court’s ruling is those objections are overruled.

A.        They would
leave Smith County.

Q.        (By Mr.
Murphy)  What was the purpose of those children, based on your investigation,
leaving Smith County, going to the Mineola swingers’ club; what was the purpose
of that?

A.        To perform
sex acts at the club.

Q.        What would
happen to the kids if they didn’t perform the sex acts, based on your
investigation?

MR. DAVIDSON:  Objection,
calls for hearsay; calls for speculation; lack of personal  knowledge on the
part of the witness; and violation of the confrontation clause; Article 1,
Section 10, Texas Constitution; as well as Sixth Amendment, U.S. Constitution.

THE COURT:  Those
objections are overruled.

A.        They would be
-- food would be withheld from them, and they would not be able to eat.

Q.        (By Mr.
Murphy)  Did they say whether or not they liked it?

MR. DAVIDSON:  Objection,
Your Honor.  Objection to form; and also objection, leading.

THE COURT:  Rephrase
the question, Mr. Murphy.

Q.        (By Mr.
Murphy)  Through the course of your investigation, did it ever appear as if
they enjoyed what they were doing in that club?

MR. DAVIDSON:
Your Honor, objection, lack of personal knowledge; speculation and form.

THE COURT:
Overruled.

A.        They did not.

 









[1]
See Pittman v. State, No. 14-08-00710-CR, tried in March 2008; Mayo
v. State, Nos. 14-08-00622-CR, 14-08-00623-CR, 14-08-00624-CR, tried in May
2008. All three appeals were transferred to this court.





[2]
We have employed pseudonyms for the children to protect their identities.





[3]
Shannon and Holden denied the allegations during a Wood County Children’s
Assessment Center interview.





[4]
Sheila is the mother of Mayo and Ginny and the grandmother of Shannon and
Holden.





[5]
Cases are pending in a Smith County district court against three other
defendants, including Dennis Pittman, Sheila Sones, and Jimmy Sones.   





[6]
During appellant’s lengthy cross-examination of Shannon, she described several
rather bizarre incidents.  For example, Shannon described an incident that she
said occurred at the Mineola club where, during a video-taped “play,” Jamie
Pittman shot her brother Holden’s dog.  (Although Holden described a similar
dog-shooting incident, he described the dog very differently from Shannon and
claimed the shooting occurred out-of-doors.)  She further described an occasion
at the club when Pittman hung several live chickens.  Shannon also testified
that Sheila Sones and Holden were able to cast magic spells.





[7]
During a video-taped interview played for the jury, Cathy also made some
strange claims.  For example, when Kemp asked her about costumes, she explained
that she dressed as a witch at the club.  She said she flew around the club on
a broomstick; she also said that Shannon dressed as a ghost and floated around
the club, and Holden dressed as a bear and crawled around the club.   





[8]
In his first issue, appellant asserts that the State violated Brady v. Maryland,
373 U.S. 83, 87 (1963), by concealing impeaching or exculpatory evidence about
John and Margaret Cantrell.  For further discussion of alleged Brady
violations in all three of these trials, we refer the reader to Pittman v.
State, No. 14-08-00710-CR, slip. op. at 8–11.

 





[9]
These excerpts are two examples where the trial court warned appellant to stay
away from any questions that might bring to light the allegations against John
Cantrell, which appellant alleged showed the Cantrells’ motivation to coach the
children into fabricating the charges against him.  Appellant has identified
numerous other examples in his brief.  We thus disagree with the State’s
contention that he did not preserve error on these issues.





[10]
Thad Davidson and Tina Brumbelow represented appellant at trial; the State was
represented by Joe Murphy and Jason Parrish.





[11]
The State also responds to this argument by asserting these allegations were
inadmissible under Texas Rule of Evidence 608(b), which provides that specific
instances of a witness’s conduct are not admissible to attack or support
credibility.  But appellant was not attempting to attack or impeach John
Cantrell’s credibility with this information.  He was attempting to establish
his defense that if the children were abused, John Cantrell was responsible and
the Cantrells coached the children into making these allegations to cast the
blame on others and divert attention from the California allegations.  See
Holmes v. South Carolina, 547 U.S. 319, 328–31 (2006) (disapproving of
evidentiary rules that operate to unreasonably restrict the admission of
evidence proffered by criminal defendants to show someone else committed the
crime with which they are charged).

The State and the trial judge also recognized that
this evidence could have been relevant to show bias.  The State, over objection,
was allowed to impeach appellant’s witness, Anlique Stamps, the bartender at
the Brass Star Club, with the fact that her children had been once removed by
DFPS.





[12]
The State knew that the conviction should not come into evidence unless the
co-defendant testified.  In the State’s pre-trial motion in limine, the State
requested that no mention be made about “the disposition of any case against
co-defendants/accomplices, unless said co-defendant and or accomplice
testifies.”





[13]
Appellant had asked during cross-examination whether this individual had
testified previously in the Mayo and Pittman trials, but did not go into the
specifics of any of her testimony.  But even if he had impeached the witness
with prior testimony, this would not “open the door” to evidence of the
convictions.





[14]
We thus disagree with the State’s contention that appellant waived these
complaints by failing to object.





[15]
The trial court apparently knew that such conviction evidence is inadmissible. 
When appellant’s trial counsel asked Kemp whether appellant had been convicted
of a felony, the following colloquy occurred:

Q:        (By Mr. Davidson)  Does Patrick Kelly have a
felony conviction?

MR. MURPHY:           Judge,
I'm going to object as to relevance.

THE COURT:              The
Court sustains the objection.  Mr. Davidson, approach the                                                           bench
just a minute. 

(At
the bench, on the record.)

THE COURT:              What
are you doing?

…

THE COURT:              I’m
telling you right now, you pull a stunt like that again, I’m                                                             going
to have a contempt hearing on you.  I’m going to tell you                                                          right
now.  The warning is on the record.

                                    You
know that whether or not he has been convicted before or has not been convicted
before is only going to be admissible under two circumstances.  If he testifies
and he has an impeachable offense, that’s admissible.

If he
testifies or if you’re proving eligibility for probation at sentencing, you may
have accomplished what you wanted to accomplish, but you well know what you did
is totally outside the rules, totally outside the rules of evidence.

I’m going to
instruct the jury to disregard that answer totally, because I know you know better,
Mr. Davidson.

Go have a
seat.

MR. DAVIDSON:        Yes,
sir.

(End of bench
conference.)

            THE
COURT:              All right. Ladies and Gentlemen, the Court is going to
instruct you to totally disregard Mr. Davidson’s last question to the witness and
any answer that was given.





[16]
The State suggests these statements were appropriate closing argument because
the record shows that Mayo and Pittman were convicted.  We agree the record
reflects that Mayo and Pittman were convicted and sentenced to confinement for
life.  However, as discussed above, appellant objected to the admission of this
evidence and the trial court inexplicably and erroneously overruled these
objections.  We thus disagree this argument was a proper “summation of
the evidence.”  The State also asserts this argument was permissible as a
response to appellant’s argument.  Specifically, the State contends that
because appellant’s counsel stated during closing, “I don’t know whether Jamie
and Shauntel ever did anything sexual with those kids or not[,]” it was
appropriate for it to emphasize they had been convicted.  We must disagree with
this argument.  Appellant’s statement that he personally did not know whether
Mayo and Pittman had sexually abused the children did not “open the door” to a
response they had been convicted for their involvement in this child sexual
exploitation ring.  See Brown v. State, 270 S.W.3d 564, 572 (Tex. Crim.
App. 2008) (stating that, in responding to opposing counsel’s argument, the
State may not “‘stray beyond the scope of the invitation’” (quoting Johnson
v. State, 611 S.W.2d 649, 650 (Tex. Crim. App. 1981))).





[17]
Generally, an appellant must have objected on the ground that the prior statement
did not predate the improper influence or the motive to fabricate to preserve
that argument for appeal.  Bolden v. State, 967 S.W.2d 895, 899 (Tex.
App.—Fort Worth 1998, pet. ref’d).  But “[w]hen the correct ground for
exclusion was obvious to the judge and opposing counsel, no forfeiture results
from a general or imprecise objection.”  Resendez v. State, 306 S.W.3d
308 (Tex. Crim. App. 2009).  On this record, we have no doubt that the
prosecutor and the trial court were aware that this was the basis of defense
counsel’s hearsay objections to this testimony. 





[18]
We note the trial court appeared to be operating under the mistaken impression
that, so long as “Witness A” testified at trial, it was permissible for
“Witness B” to repeat statements made by “Witness A.”  The trial court’s
fundamental misunderstanding of what constitutes hearsay is exemplified by the
following comment made in response to the State’s hearsay objection when
appellant’s counsel was cross-examining Ranger Kemp, “What I’ll let him testify
to is what his interviews with these children, who are all going to be
testifying or have already testified in the case.  I’m going to sustain the
objection, unless it’s based on something that he’s talked to the children
about.”  (emphasis added).  This misapprehension seemed to work almost
entirely to appellant’s detriment, however, because the majority of the State’s
hearsay objections were sustained.  





[19]
Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993).





[20]
Numerous other witnesses also testified that they believed the children were
being truthful.  However, appellant did not always object to this testimony,
nor did he object to Hachtel’s statements that she believed the children were
being truthful.

Both the State and the trial judge knew that it was
improper for a witness to testify that the children were telling the truth. The
trial judge twice sustained the State’s objection during the cross- examination
of Kemp as to whether or not what Shannon said was truthful or accurate.





[21]
541 U.S. 36, 53–54 (2004).





[22]
See Crawford, 541 U.S. at 53–54





[23]
As noted above, Thad Davidson and Tina Brumbelow represented appellant at
trial; the State was represented by Joe Murphy and Jason Parrish.